# UNITED STATES v. PRIEST RAPIDS IRR. DIST.

# PRIEST RAPIDS IRR. DIST. v. UNITED STATES.

## No. 11704.

United States Court of Appeals
Ninth Circuit.
June 21, 1949.

DENMAN, Chief Judge, dissenting.

A. Devitt Vanech, Asst. Atty. Gen., Bernard H. Ramsey, Sp. Asst. to Atty. Gen., and John F. Cotter, Atty. Dept. of Justice, Washington, D. C., for U. S. A.

Moulton & Powell, Kennewick, Wash., J. K. Cheadle, Spokane, Wash., for Priest Rapids Irr. Dist.

Before DENMAN, Chief Judge, and HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

The United States, hereafter called the Government, sued to condemn all of the property of the Priest Rapids Irrigation District, a quasi-public corporation of the State of Washington, hereafter called the District. The lands sought to be taken were for a large project in aid of World War II. The Government paid into court the sum of $170,500 [1] on its declaration of taking the District's properties, as its estimate of their value.

### History of the Case

On or about February 23, 1943 an "overall" condemnation proceeding was commenced below by the Government (Case

---

[1] As hereafter appears, the Government contends that payment of this sum entitled it to possession and ownership of so-called "properties of the District." This sum represented the amount of the outstanding indebtedness of the District, and an order of the court this debt was fully discharged by the money so paid by the Government.

No. 128) to acquire title to and possession of an area of about 206,000 acres of land for the purposes of the above mentioned Government war project. Included in this enormous area was all of the land lying within the District.[2] In reality Case No. 128 was a single suit, even though separate trials were given the several amended petitions. The Government appears to have controlled, in some measure, the division of the suit for these separate trials by filing amended petitions more particularly describing various, comparatively small, groups of tracts. (See footnote 4.)

On May 12, 1944 the Government filed an amended petition in this main case (128), this proceeding being designated below as case or file 128-99. The instant appeal is from the judgment in this particular proceeding which specifically sought condemnation of all of the operating properties and facilities owned or claimed by the Districts.[3] It appears that at this time the Government had acquired, by purchase and/or condemnation, and was the sole owner of, *all* of the land lying within the boundaries of the District.[4] This acquisition had been accomplished in the interval between the filing of the original petition, and May 12, 1944. Part of the land acquired by purchase was an area of more than 10,000 acres which had been in the hands of the District. For this large tract the Government paid $49,000 and this purchase price will indicate the small value placed by the District upon much of the land within the District.

The issue below and on this appeal is the compensation, if any, which the Government should be required to pay to the District for the "operating properties and facilities" above mentioned, in addition to the $170,500 already paid, as their estimated value. A jury was empaneled to determine certain factual issues formulated by the court, and based on its verdict the court entered judgment for the District and against the Government in the sum of $473,356, with interest. The judgment awarded to the Government the title to all "District property" upon the payment of that sum into the court below and provided that this money was to be held, subject to the orders of the lower court, until the dissolution of the District in liquidation proceedings "to be maintained" in the Superior Court of the State of Washington. Concerning such dissolution proceedings, see Chapter 8 of Title 48, "Disorganization of Districts," "Remington's Revised Statutes of Washington," Vol. 8, § 7526 et seq.

Both parties appealed from the judgment entered upon the jury's verdict.

The verdict was the result of specific instructions of the court, one of which directed the jury to determine the value of electric *power properties* of the District, *less that portion of their value* which the jury should find *had been required for irrigation purposes of the District*. Responding to this specific directive the jury determined this particular part of such value to be $473,356.00 as of October 1, 1943.

The court also directed the jury to answer a special interrogatory. It called for a jury determination of the value of certain types of District property which were generally designated as "irrigation properties," and to *include* in this category of "value" *that portion* or segment of the value of the above mentioned *power properties* which the jury should determine was required for "irrigation purposes" of the District. The District property to be described in the answer to the special interrogatory was defined by the court to be the pumping plant, the power transmission line from Coyote Junction to the pumping plant, the main and lateral irrigation canals, and that part or percentage of the power plant and the transmission line from the plant to Coyote Junction de-

---

[2] At the time of initiating the condemnation proceedings, the District embraced 15,950.39 acres. Of this area, 3552.13 acres were privately owned; the State of Washington owned 2194.83 acres, and the United States 38.16 acres. Most of the land—10,165.27 acres—was in the hands of the District.

[3] At various times from April, 1943 to October, 1943 the Government took possession of the so-called "District property" (the subject of this action) under an order or orders granting immediate possession.

[4] The Government acquired, in separate condemnation cases, some of the privately owned tracts in the District. The rest were purchased by direct negotiation with the owners. (See footnote 6.)

voted and applied to irrigation purposes at the time of taking, or that would have been so devoted and applied in all probability within the reasonably near future. By way of clarification the court added the admonition that the jury was to divide and allocate the cash, market value of defendant's properties in accordance with its irrigation and non-irrigation uses and purposes. The non-irrigation value which the jury was to find was to be included *in its general verdict,* and the irrigation value was to be included in the statement of value set out in the jury's answer to the special interrogatory. The sum of these two amounts should equal a fair, cash, market value of all of the properties of the District involved in this action. Pursuant to this directive the jury made such an "allocation" and by its answer determined that the value of this kind of "irrigation property" was $365,845 as of April 1, 1943.

In its judgment the court recited generally that the bonded indebtedness of the District was a lien upon these so-called *irrigation properties* of the District,[5] and that the $170,500 deposited by the Government as estimated just compensation for the taking of *all* of the property of the District shall be a charge *against the irrigation properties only* and that no other sum shall be paid by the Government as just compensation for the taking of (these) *irrigation properties.*

With this view of the law as respects compensation and based upon this division of values, the court entered judgment for $473,356, which sum was declared to represent the value of District power properties *less* the portion of the value found by the jury to be required for "irrigation purposes." The judgment rejected the claim of the District that it was entitled to compensation for these so-called *irrigation properties* upon which the jury had placed a value of $365,845. Judgment went accordingly.

The reason for, and the basis of, the judgment in this case is indicated in the record which shows that at the trial (conducted under two judges, Judge Driver succeeding Judge Schwellenbach) the court made its own arbitrary division of so-called "District properties" into two categories. The first one included the electrical power properties of the District which were (under Washington law) created and/or acquired to make possible (through the use of electric energy) the placing of irrigation water on District lands.

The second category included assets referred to by the court as "irrigation properties," and in this category the court also *included that part* (of the value) of the power properties (referred to in the first category) which were "used" to service the irrigation needs of the District. This particular "part," (or value thereof) was to be *excluded* from the first category. As respects these so-called "irrigation properties" to be included in the second category, the "special verdict" of the jury found them to have a value of $365,845 and, as indicated above, the District claim for compensation for properties in this second category was rejected.

The application of this "division of values" formula was the result of a decision reached by Judge Driver in which he stated that he felt an obligation to apply a (this) formula previously adopted by his predecessor, Judge Schwellenbach, who had expressed the view that the landowners within the District were, in a sense, in a dual position—they owned irrigated land with water rights appurtenant thereto for which they were entitled to compensation—they were also, in a sense, in the position of stockholders in the District, that is, they were entitled to compensation in (for) their proportionate share of the (corporate) "assets of the District."

The "assets," (which Judge Driver regarded as being required for "irrigation purposes",) had been viewed by Judge Schwellenbach "as the irrigation assets or assets adapted to and used for the supplying of water for the lands." These were considered by Judge Schwellenbach as having "entered into and became a part of the value of the land and [for which] the Government compensated the owner for that [sic] when they paid him the fair market value of the land as determined by the jury." [6]

---

5 See reference herein to Washington Statutes relating to Irrigation Districts.

6 Judge Schwellenbach had already carried on or concluded separate jury trials

Judge Driver assumed that the Schwellenbach formula meant that as to the assets of the District *"which were not used exclusively for irrigation,* that they did not enter into the value of the land as determined by the jury, that the owner was entitled to his pro-rata share as to the *value of those properties not used for irrigation."* (Emphasis supplied.) He further clarified his view of the rule to be applied as follows:

"I think we should regard this situation as it existed at the time of the taking by the Government, and at that time the power plant was an integral part of the irrigation system, and was devoted to irrigation purposes *to the extent of the power used for pumping water for irrigation,* and on that basis the objection [of the Government] will be sustained."

And again:

"I think if the formula is to be applied it would have to be applied to the situation as it existed in 1943, and the power plant then was an integral part of the irrigation system, and to a certain extent, *its use was allocated and applied for pumping water for irrigation."* (Emphasis supplied.)

These and other comments of the judges set out or referred to below make plain the reason for the kind of judgment entered in this case.

Certain facts established in the evidence throw interesting sidelights on the case. Despite the large acreage included within the corporate boundaries of the District, only 1200 acres of land were actually supplied with water, i. e., "under irrigation." About 12,000 acres had never been "irrigated." As a result of this situation, the electrical generating plant owned and operated by the District was not required to devote all of its capacity and output to service the actual irrigation needs of the District. For this reason the District had arranged to sell its surplus power output to a private power company, and the record shows that over a period of eleven years preceding the trial the District had sold to this company 55% of the electric energy it produced. The record also shows that *all* of the revenue derived from such power sales was employed to support and carry on (under Washington law) each and all of the corporate purposes of the District including maintenance and operation, and servicing the outstanding bonded indebtedness. This application of power revenues would, of course, reduce assessments on private lands to meet debt obligations of the District. It is not to be doubted that in this sort of District operation the power plant was being fully used to promote and support all of the declared purposes of such a district.[7]

Before reaching the contentions of the parties on this appeal we refer to the fact that Judges Schwellenbach and Driver were confronted with the necessity of considering and dealing with what seemed to them to present an anomalous and unpre-

involving many of these original landowners—all of them except those who had conveyed their lands to the Government by deeds. (See footnote 4.) Judge Schwellenbach was here referring to jury verdicts in these cases. During the trial the District made an offer of proof showing the total amount paid by the Government for all lands of every kind and character within the District. This amount was $330,960.80. For all of the lands within the District which were privately owned (3552.13 acres) the Government paid to the owners thereof, or deposited for their benefit, the sum of $574,164.30 which sum represented an average compensation for such lands slightly in excess of $160 per acre. The offer was denied by the court on objection by the Government, one objection being that the value of the (District) facilities could not be established by proof of the sum paid by the Government for all lands in the District, and the value of these facilities for the use for which they were intended could only be determined by the additional value given to the lands through their utilization for the purpose for which they were intended; that the difference between the alleged cost price of these facilities and the sum paid for these (District) lands in no way reflects the value of the facilities.

[7] This utilization of power plant revenues finds sanction in the State law under which these districts operate and enjoy corporate existence. See Chapter 5 of Title 48, "Irrigation Districts," Remington's Revised Statutes of Wash. Vol. 8.

cedented situation. Both referred to the fact that counsel had not cited authorities which dealt with. a comparable problem. Both were frankly impressed with the strength of the Government's position, Judge Driver stating that he regarded it as "strong * * * almost unanswerable," and Judge Schwellenbach stated that there were "good grounds," for the Government's view. However, both Judges were persuaded that basic notions of equity and justice called for the application of the formula here applied. Both were convinced that it would have produced a chaotic situation and one resulting in interminable delay had the question of each landowner's claimed pro-rata "interest" in so-called "District assets" been submitted to individual juries trying the various condemnation suits to acquire individual privately-owned tracts of land with the consequent necessity of presenting, over and over, the question of value of these "assets." The probability of a different figure of value thereon in each of these cases presented an insoluble problem, as indicated in illuminating comment and rulings by the district judges.

In meeting this situation they employed the so-called Schwellenbach formula, and their reasons for so doing present a very persuasive argument. Its "division of values," appealed to them as offering a logical and just solution of the dilemma confronting them by reason of the very peculiar posture of this case.

No appeals were taken from the awards in the cases (see footnotes 4 and 6) where private lands within the District were condemned by the Government, and the lower court was without the benefit of an expression from this court as to the "rights" of these private landowners in so-called "District assets" which could or might have been asserted in those cases.[8]

### The Government's Appeal

It is the position of the Government that when it became the sole owner of *all* of the land within the District (District debts being extinguished as above indicated), it became the owner of all of the beneficial title to the District's property without payment of any further sum than the $170,500. It places reliance on a decision of the Supreme Court of Washington, In re Horse Heaven Irrigation District, 11 Wash.2d 218, 118 P.2d 972. That case held that distribution (of district assets) should be confined to those who owned land in the district *at the time it was dissolved*. It also held that the district owns property and operates wholly in a proprietary capacity—for the benefit of the landowners—they are the beneficiaries of a trust. Upon this authority the Government argues that having acquired *all* of the land in the District, it is the beneficiary of the trust.[9]

[8] The record shows that when the individual condemnation cases were tried, the Government successfully resisted efforts of owners of these condemned private tracts to have the juries in these several cases fix the pro-rata share of so-called District assets each owner might be entitled to receive in the event of a dissolution of the District. In these cases, the Government asserted that it intended to acquire all of the property within the District, as a result of which it would then become the owner of the facilities and instrumentalities of the District. This posture of the case led Judge Schwellenbach on April 26, 1944, and in the instant case, to advise Government counsel that since there had been an abandonment of appeal efforts in these (private) cases, he would reopen them (on motions for a new trial) for the admission of the proof which he had rejected on demand of the Government. unless a declaration of taking was filed before the next trial (in June, 1944). The Government thereupon, and on May 12, 1944 did file a declaration of taking of the so-called "District assets." Referring to the previous condemnation proceedings against privately owned tracts, Government counsel insisted in the case at bar that it was the contention of the Government that the water rights in the District are appurtenant to the lands being acquired by the Government; that the instrumentalities of the District are impressed with a trust in favor of the lands, and that the value of the water rights and instrumentalities is fully reflected in the values placed upon the private lands in the various condemnation cases by both Government and defendant's witnesses.

[9] Entirely aside from the question of the validity of the compensation award, we think that the court did not err by directing in its judgment that the amount of the award should be paid into the

The Government's argument in support of the foregoing contention is that *all* District-owned facilities of every kind and character were, under Washington law, *wholly* devoted to irrigation purposes and were inseparable from the lands they served, and in thinking that the District had power facilities "not applicable to these irrigation purposes," Judge Schwellenbach made the "fundamental error" since there is no basis for such a concept. This idea rested on the fact that the District sold power unneeded for pumping irrigation water but that did not *divorce* any part of the generating facilities from the irrigation project since they were designed and intended to supply the irrigation needs of those owning lands in the District. Power sales could not be permanent in light of possible needs of the District. In short, the District was lawfully required to devote *all* of its power facilities to "irrigation purposes"—they were in fact "irrigation facilities"—and having paid (under the Schwellenbach formula) for all District property "devoted to irrigation purposes," the Government thereby acquired title to the power properties.

Among other contentions urged is that in paying the former landowners the fair market value of their lands they have received in condemnation as much as they would have got from a voluntary sale; that the properties of the district were held beneficially by the District for landowners therein; that if any one lacking the power of eminent domain had purchased all of the individually owned land in the District, none would doubt that the purchaser had ipso facto acquired *all* of the assets of the District and that the former owners had lost *all* of their interest in the same; that the Government, possessing power of acquisition of title by condemnation, has

acquired all of the lands in the District and paid the former owners the full market value thereof, and requiring it to pay an additional amount for their benefit is erroneous under the doctrine of the Horse Heaven case, supra; that case held that distribution of corporate assets of the District should be confined to those who owned lands in the District at the time it was dissolved and being the present owner of all lands in the District, the Government is entitled to the legal title to the property of the District without paying any additional amount; that the Government's liability to the landowners would have been the same if the District-held properties had been taken before rather than after the taking of the privately owned lands. In this connection it emphasizes the fact that the filing of this declaration of taking of District assets and the accompanying deposit of $170,500 did not reopen the earlier condemnation cases against private landowners none of which had been appealed.

Based on these and allied reasons the Government objects to the application of the Schwellenbach formula with its resulting judgment. Our summary of its contentions is amplified by an argument of its counsel at trial. He said:

"The value of those district facilities as irrigation facilities necessarily are reflected in the value of the land. Now, that doesn't mean the value that counsel might want to ascribe to its facilities separated from their duty to the land, because after all, irrigation facilities and properties have no value except as they are applied to the irrigation of the land * * * you might get the same identical benefits from the investment of fifty thousand or five million dollars. The true value of irrigation facilities is reflected only in the benefits that accrue to the land served thereby, and the

lower court there to remain subject to the orders of the court until such time as the court should order payment of the same to the Superior Court of the State of Washington for Benton County, for the use and benefit of the District in liquidation proceedings "to be maintained" in said Superior Court. (See reference in this opinion to provision in Washington laws relating to "Disorganization" proceedings.) By directing that

payment of the award to be made to the District rather than to the landowners, the lower court left the question of disposition of this fund to be finally decided by the State court under applicable state law in the so-called "Disorganization" proceedings pending in the State court. (See Horse Heaven case, supra.) The rights of all parties are preserved under this procedure.

Government's contention and position is predicated upon the fact that the irrigation facilities are as valuable as the benefits that they confer on the lands which they serve, and if those lands are purchased and paid for as irrigated lands, with all of those benefits accruing, then the full value of the irrigation facilities for the purpose for which they were designed have been compensated. I think that makes the Government's position clear on that particular thing. * * * It [this statement] does apply to the actual value of the facilities to the lands which they serve, as irrigation facilities." (See also contentions of Government, Footnote 8.)

■ The Government also relies on the Declaration of Taking Act, 40 U.S.C.A. § 258a, which provides, inter alia, that "If the compensation finally awarded in respect of said lands * * * shall exceed the amount of the money so received by any person entitled, the court shall enter judgment against the United States for the amount of the *deficiency.*" (Emphasis supplied.) Under this provision of law, the court below was, in any event, authorized to enter judgment only for $473,356 *less* the $170,500 paid to the District on the taking of its properties, or $302,856. Its prayer is for a reversal of the judgment and remand with directions to the court to enter judgment for a nominal sum.

### The District's Appeal

The District rejects in toto all of the contentions of the Government and it assails the validity of the so-called Schwellenbach formula. It asserts that it should receive not only $473,356 as the value of its power properties, but also the further sum of $365,845 representing the value of its "irrigation properties." Against this total of $839,401 it would have us direct a credit to the Government for the $170,500 paid on the taking of District property and order the lower court to enter judgment in its favor for $668,701, with interest from the date of taking of the various segments of District property.

### The Schwellenbach "Formula"

In considering this case it is obvious that we cannot reach back to the cases wherein the private lands in the District were condemned by the Government, since we have no jurisdiction over those cases on this appeal. However, they were part and parcel of the main condemnation case (128) of which the case at bar is a part, and they were repeatedly injected into this case by frequent contentions of counsel for both parties regarding just what elements of claimed property values had (under the instructions to juries in those cases) been recognized by the court as attaching to and inhering in ownership of these lands, and submitted to the juries as an element to be evaluated and allowed as a part of the fair market value of such lands. (See rulings of the court on this point cited infra.)

As respects this factual aspect of these preceding jury trials we accept the appraisal of Judge Schwellenbach. It sustains his ruling that in the case at bar the District was asserting a claim for compensation for an element of added value attached to lands in the District by reason of the fact that they were "irrigated lands" —an element which he held had been previously considered by condemnation juries and for which compensation had been awarded to landowners in their verdicts. Judge Schwellenbach had presided over these preceding trials and had instructed the juries, and it is clear that his intimate knowledge of the posture of those cases caused him to adopt his so-called formula in this case.

Judge Schwellenbach faced the fact that in the instant case the claimant (the District) appeared in the status of a statutory "trustee" for these former District landowners, and as such trustee, was asserting its right under law to recover for beneficiaries of the trust a second compensation for property considered in the previous trials, i. e., the value of District facilities *as irrigation facilities* which was, in turn, reflected in the value of the land. The fact that this particular claim for compensation for these "irrigation facilities" was asserted by a trustee in its representative capacity rather than by the ultimate beneficiaries of the trust, did not disguise the fundamental fact that it was in reality a demand for compensation for an element of property value for which just compensation

had already been paid. We think that the court looked through form to get at the substance of the claim, and that it did not err in regarding it is an effort to secure double compensation.

Judge Driver was also aware that upon completion of the pending District disorganization proceeding in the State court, the proceeds of such a recovery, if authorized here, could not be retained by the District (it would pass out of existence) but would be delivered over to those entitled under State law to receive them. This situation led the Government to assert that in any event its present ownership of all of the lands in the District made it, in effect, the real beneficiary of the trust. It may be assumed that Judge Schwellenbach so regarded this particular aspect of the case and we think that he reached a rational conclusion. (See footnote 9.)

The matters above noted are pointed up by other rulings of both district judges which we quote or refer to since their comments serve to illustrate the difficulties they encountered in solving an extremely complicated legal problem. Before quoting these rulings we note here that this case was considered by two very capable and experienced jurists who would judicially know that these lands are in an arid region and without water would have possessed little or no value. The application of water gave them such value as they had.

Recognizing the rule that compensation should be the full equivalent of property taken, the lower court refused to ignore the obvious fact that it was the *presence, availability and use* of District irrigation facilities which *alone* imparted to, and created in, the privately owned irrigation lands taken by the Government the "added value" which was considered by the juries in the landowners' cases and for which compensation was given. These "facilities," so used and so adding to the value of the lands, were those defined under the Schwellenbach formula as the "irrigation properties" of the District, and identified as such in the judgment.

Considering this so-called "added-value" as "property," we think that the record clearly shows that the Government had been required by the instructions of Judge Schwellenbach to compensate private landowners for this element of "value" in the previous condemnation cases, and that the lower court did not err in refusing to allow further compensation for it in this case. Any other conclusion would impeach the jury verdicts upon which both judges deliberately based their rulings in this case.

As we have indicated above, the procedure which applied the Schwellenbach formula appears to have been born of necessity due entirely to the awkward posture of the case, but it also clearly appears that in applying it the lower court was appraising realities and utilizing a practical remedy which, in its end result, insured payment of just compensation for any property taken in this case. If applying the formula did not result in denying just compensation for property here taken, it is not open to attack on purely technical grounds. We would sacrifice substance to form if we reached any other conclusion.

We conclude that the record does not sustain the attack on the validity of the Schwellenbach formula. The reasons for its use advanced by both district judges in their rulings during the trial provide a rational foundation for this view. Judge Schwellenbach said: (he was here speaking exclusively of the non-irrigation assets, not of the so-called "irrigation assets")

" * * * The fact is that, in the first case which was tried, the landowner attempted to assert his claim to his proportionate share in the District's assets, the petitioner [Government] objected and I ruled against the landowner. The basis of this ruling was that in the trial for the purpose of determining the compensation to be paid for a separate tract, there was no room to try out also the value of that landowner's proportionate share of the District assets. He was not the owner of the legal title to the District assets. He had no right to assert a direct claim to his proportionate share. Furthermore, as a matter of procedure, if I had permitted each landowner to assert his claim in each separate trial, it would have resulted in chaos and interminable delay as a consequence of which this [these] cases never would have been

completed. \* \* \* it would have resulted in an absurd situation because the landowner in one case would have a jury fixing one value upon the District's assets and then the jury in the next case might place an entirely different value upon the District's assets. The awkwardness and the confusion which would have resulted was realized by counsel on both sides and dozens of cases have been tried since with the understanding that, at some time, the question of the right of the landowners to their proportionate share of the value of the District assets would be thrashed out.

"On the other hand, the landowners are not entitled to compensation for that portion of the District assets which was valuable only for irrigation purposes. *In each one of the trials and in all of the appraisals,* the value of the separate tracts was based upon the proposition that they were within the irrigation district and had irrigation water available. Verdicts and settlements which have been made in these cases have been substantial. They have been based upon the land valued as irrigated land. For the owner of the lands now to receive compensation for the District assets which were devoted to irrigation purposes would amount to double compensation. \* \* \*

"It seems to me that what must be done in this case is that the Districts set up in their answers their contention as to the value of *that portion* of the [District] assets in each instance *which is not applicable to irrigation purposes and make claim for that amount after giving credit for the sums the petitioner* [Government] *expended in the payment of District obligations.* \* \* \* as I look at the answer of the defendant Richland Irrigation District, I do not see how *it* can be entitled to any compensation. *It* was exclusively an irrigation district and *its* assets were *exclusively used for irrigation purposes.* Any assets listed *which were not so used* were more than covered by the $97,000 which the petitioner [Government] paid. On the other hand, the Priest Rapids District, according to its answer, owned non-irrigation assets valued substantially in excess of the amount of the bond money paid on its behalf." (In speaking of "Districts" and Richland Irrigation District, Judge Schwellenbach evidently alludes to the fact that more than one irrigation district was included in the overall acquisition by the Government in Case 128. Such a reference also appears in the rulings of Judge Driver.)[10]

In his summation at the close of the case Judge Driver made plain that his judgment would provide compensation to the District for only that portion of its facilities not devoted to irrigation uses, his view being that the Government had already in effect paid the equivalent of the value of the irrigation assets of the District in its payment to the individual landowners within the District. He amplified this conclusion by a further reference to Government acquisition of private lands in the District, in which he stated that:

"the land is purchased as irrigated lands with the water right attached, that is, with the water right or the duty of water to which the land was entitled by reason of being included in the irrigation district."

◼ We are in accord with the conclusion of the lower court that utilization of the Schwellenbach formula was eminently fair under the unprecedented circumstances of this case, and that applying it did not work a confiscation of private property or property rights of the District landowners. In this view of the case it logically follows that at the time of entry of judgment the Government had fully paid for and was the owner of all of the so-called irrigation assets of the District.

It would unnecessarily expand this opinion to quote verbatim the rulings of Judge Driver. It is sufficient to say that he appears to have followed and applied the Schwellenbach formula except as to the application of the $170,500 payment made by the Government. It is clear from the record that Judge Driver was fully persuaded that in the cases involving the private lands previously condemned, the juries had been called upon to determine their fair market value which was a value reflecting their strategic situation and their value for all purposes for which they could

---

[10] See our holding at the conclusion of this opinion. We supply emphasis on all quoted rulings of the district judges.

be used. Had something in addition been allowed because of the appurtenances in the way of water, ditches, pumping plant and power plant for the furnishing of water, the result would necessarily have been a double recovery. We know, as reasonable men, that without these essential appurtenances the lands would have been substantially valueless.

The record shows that the State of Washington owned 2,194 acres, (acquired by the Government) and that the District itself owned 10,165 acres. These District lands were acquired by purchase at a price put upon them by the District in 1942, prior to the institution of condemnation proceedings, when the District placed these lands in the hands of a real estate concern in an attempt to sell them, that price being approximately $49,000. These were undoubtedly lands of inferior quality, the owners having long ceased to pay assessments against them.

█ It is certainly clear that as to those landowners, including the District, who sold their lands outright to the Government without condemnation proceedings, there could be no legal ground of their complaining as to the price they obtained. It is only as to those individuals whose lands were condemned that any rational grievance can exist, and as to them their cases are res judicata, and not again to be inquired into collaterally in a state court dissolution proceeding or any other kind of state court proceeding.

We are convinced that the final judgment must be modified if it is to conform to the basic theory on which this case was tried. In this conclusion we have due regard for the interpretation of the Schwellenbach formula as expressed in the various trial rulings of both judges below. (See text of Judge Schwellenbach ruling immediately preceding footnote 10.)

For the reasons above stated the lower court was in error in failing to provide in the judgment that the $170,500 paid by the Government should be applied as a credit against the award of $473,356. Judgment against the Government for $302,856 should have been entered.

The case is remanded with directions to the lower court to modify the judgment in accordance with the foregoing views.

DENMAN, Chief Judge (dissenting).

This decision violates (a) the federal condemnation law, (b) the law of the State of Washington, and (c) the Fifth Amendment's prohibition against the taking of property without compensation.

The court's opinion, by failing to state succinctly the principal fact and the principal authority relied upon by the government, contains pages of discussion of irrelevant matter concerning formulae of compensation to the former landowners of the district in separate condemnation proceedings, none of whom are parties to this proceeding.

A. *No landowner in the district has title in the district properties serving his land. His interest in the district properties held by the district in a proprietary capacity is no more than that of a stockholder in the properties of a corporation serving him by its dividends. Hence no title in the district properties is acquired by a purchase from a prior landowner of land so served.*

This is apparent from the decision of the Washington Supreme Court In re Horse Heaven Irrigation District, 11 Wash.2d 218, 227, 118 P.2d 972, 976, where that court held:

"An irrigation district is a corporation which * * * *owns and uses its property in a strictly proprietary capacity* for the primary benefit of the owners of land included within the district. With the acquisition as owner of land in an irrigation district that owner immediately acquires an interest in all property of that district. When the district ceases to be a district the interest of that *owner is as definite and certain as is the interest of a shareholder in an ordinary corporation.*" (Emphasis supplied.)

Of this quotation, the government states:

"Accordingly, the court held that the distribution should be confined to those *who owned land in the District at the time it was dissolved.*" (Emphasis supplied.)

B. *Like the stockholder, the private landowner, when he sells his land, includes*

*in its value his anticipated value on distribution of the corporation's assets.*

*Such a factor in the sale or condemnation of private land served by the district or in the sale of stock does not convey any title in the properties of the corporation serving the private landowner or stockholder.*

This is the fundamental error in the court's opinion. It is elemental that the government got no more in acquiring some of the land by condemnation than it acquired by direct purchase from the landowner. In condemnation the jury properly should consider, in valuing the land of the private owner, the anticipated value of the corporation's properties on dissolution.

The value of this interest in the anticipated distribution is in *all* the corporation properties, both those directly serving the privately owned land and also, here, the plant producing power sold to a non-landowner.

If, in the condemnation proceedings against the private landowners, the jury was not allowed to include in the value of their land the anticipated value at dissolution of either the factor of the irrigation ditches and canals owned by the district or the factor of the power plant, that error could be cured only on appeal here by the individual wronged. It is admitted that none has appealed. Hence if the government acquired the privately held land for less than its real value, no private landowner can now complain. The government now owns all the land in the district, with its *anticipated* value upon distribution at the district's dissolution of *all* the district properties.

It is elemental that, because the government now holds all the privately owned land, that mere ownership does not constitute the statutory dissolution of the corporation.

C. *In federal condemnation proceedings, it is now the law of this circuit that the government acquiring the stock of a corporation at once acquires, pro tanto, title to the corporation's assets.*

This necessarily follows from the court's opinion that the Horse Heaven case is controlling. There it is squarely held that the interest of the private landowner in the assets of corporate district is identical with that of the stockholder in his corporation's assets.

That this is contrary to universally recognized corporate law is stated in Rhode Island Hospital Trust Co. v. Doughton, 270 U.S. 69, at page 81, 46 S.Ct. 256, at page 258, 70 L.Ed. 475, 43 A.L.R. 1374:

"The owner of the shares of stock in a company is not the owner of the corporation's property. He has a right to share in the earnings of the corporation, as they may be declared in dividends, arising from the use of all its property. In the dissolution of the corporation he may take his proportionate share in what is left, *after all the debts of the corporation have been paid and the assets are divided in accordance with the law of its creation. But he does not own the corporate property."* (Emphasis supplied.)

D. *The court's decision violates the Fifth Amendment. It is now the federal condemnation law of this circuit that the condemning court need not pay the corporate owner of condemned properties the judgment for this amount, but that it may withhold it until the corporation is dissolved.*

This court holds that the district corporation is entitled to an award of some $473,356 for its properties condemned to the government. It holds that the district may never be paid these moneys, but that they shall be paid into court to be held in the district court for distribution *after* the conclusion of a *state court proceeding* for the dissolution of the corporation holding such a judgment. Then, if the government still owns all the land, it will be repaid its deposit. It will never be paid to the successful litigant, though it well may need funds for the expenses of dissolution, if dissolved.

Nowhere does the condemnation legislation warrant such a withholding of the judgment awarded for taking the title of one's properties. The government does not become merged into the corporation by reason of the ownership of all the privately held land, any more than it does when it acquires all the stock of a corporation.

In United States v. Strang, 254 U.S. 491, 41 S.Ct. 165, 65 L.Ed. 368, the court affirmed a sustaining of a demurrer to an indictment charging defendant with violating Section 41, Criminal Code [now 18 U.S.C. A. § 434], which made it a felony for an officer of a corporation or member of a firm to be employed as agent of the United States for the transaction of business with such firm. Defendant was an employee of the Fleet Corporation, all the stock of which was owned by the United States. He was also a member of a partnership, a ship outfitting company. As agent for the Fleet Corporation he signed three orders for the outfitting company to repair and alter a ship. The court said, 254 U.S. at page 493, 41 S.Ct. at page 166, 65 L.Ed. 368:

"Notwithstanding all its [Fleet Corporation's] stock was owned by the United States it must be regarded as a separate entity * * *. Generally agents of a corporation are not agents of the stockholders and cannot contract for the latter. Apparently this was one reason why Congress authorized organization of the Fleet Corporation."

From the above, it is apparent that this court is enabling the government to deprive the district of its properties without just compensation, in violation of the Fifth Amendment to the Constitution.

The judgment should be reversed.