**RICHLAND IRRIGATION DISTRICT,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 13542.

United States Court of Appeals
Ninth Circuit.

April 27, 1955.

Rehearing Denied Aug. 10, 1955.

Chambers, Circuit Judge, dissented.

Moulton, Powell, Gess & Loney, Kennewick, Wash., Charles L. Powell, Spokane, Wash., for appellant.

Perry W. Morton, Asst. Atty. Gen., John F. Cotter, Edmund B. Clark, Special Assts. to Atty. Gen., Bernard H. Ramsey, Special Asst. to Atty. Gen., for appellee.

Before BONE, ORR and CHAMBERS, Circuit Judges.

ORR, Circuit Judge.

We have for consideration two appeals consolidated for hearing. The cases in which the appeals are taken were numbered 128–98 and 128–100 in the trial court.

The United States of America, in order to provide space for the Hanford atomic project situate in the state of Washington, instituted condemnation proceedings involving some 204,000 acres of land. Property in private ownership as well as properties of appellant Richland Irrigation District were taken. District properties are involved in the cases now before us. Two declarations of taking were filed. The declaration in case 128–98 was filed on May 20, 1944, while that in case 128–100 was filed on May 23, 1944. Lands taken under 128–98 had been acquired by the District through foreclosure actions. Declaration of taking in 128–100 was intended to take all the outstanding titles and interests of the District not taken and compensated for in suits against private landowners or in 128–98. In suit 128–98 a trial was had before the court sitting without a jury, a jury having been expressly waived.

In the 128–98 suit the Court valued the foreclosed lands together with appurtenant water rights in the sum of $114,017.72. Subsequently, case 128–100 was tried before a jury. In that suit the Court rejected offers of proof of the value of the water rights allocable to the foreclosed lands and the irrigation properties of the District, consisting of canals, ditches, laterals, and diversion works. Proof of the value of the water rights appurtenant to the foreclosed lands was rejected for the reason that the rights had been properly compensated for in 128–98; proof of the value of the

irrigation properties was rejected on the ground that the properties had been compensated for in the actions against private landowners. The trial court instructed the jury to return a verdict in a nominal sum on the theory that compensation had been given in suits against private owners and in case 128–98 for all property of value within the District, and that no more than bare legal interests remained to be taken in 128–100.

The District argues that the Court erred in valuing the foreclosed lands together with appurtenant water rights in 128–98. It insists that the declaration of taking in 128–98 took the land only, while the declaration in 128–100 condemned appurtenant water; hence, water rights should have been valued in 128–100 separately from the land. It is further contended by the District that in the event it be held that the valuation of the appurtenant water rights in 128–98 was proper, then the valuation placed thereon by the trial court was grossly inadequate and is without support in the evidence. In addition, it is argued that the awarding of no more than nominal damages in case 128–100 for the irrigation properties of the District was erroneous and constituted a violation of the requirement of just compensation contained in the Fifth Amendment.

■ The filing of a declaration of taking which by apt words condemns a property interest immediately vests in the Government title to the interest described; and the Government thereby becomes obligated to pay for the condemned interest in the proceeding in which it is described. United States v. Sunset Cemetery Co., 7 Cir., 1942, 132 F.2d 163. The District relies on the wording of the declarations of taking in cases 128–98 and 128–100 to support its contention that the foreclosed lands should have been valued separately from appurtenant water rights.

The declaration of taking in 128–98, which describes the various tracts of foreclosed land held by the District, declares that the estate taken is "the full fee simple title thereto subject, however, to existing easements for public roads and highways, for public utilities, for railroads and for pipe lines, and for existing irrigation ditches, canals, and laterals owned by the Richland Irrigation District." This declaration makes no specific mention of appurtenant water rights.

The declaration of taking in 128–100 declares that part of the estate there taken is "the fee simple absolute title to the property described as Parcel RD-3." A part of the property described as Parcel RD-3 is: "All water rights and appropriations of water from the Yakima River made or owned by the Richland Irrigation District, a corporation."

It is the position of the District that the Government, by phrasing the declarations of taking so as to specifically mention water rights in 128–100 but not in 128–98, bound itself to compensate separately for the land in 128–98 and for the water rights in 128–100. The trial court held that the declaration in 128–98 took the land and appurtenant water rights; that the declaration in 128–100 took the bare legal title to the water separated from any beneficial interest. In this interpretation we concur.

■■ Under the law of the state of Washington the grant or acquisition of a full fee interest carries with it appurtenances to the land. The express mention of either the particular appurtenances involved or appurtenances generally is unnecessary. They pass by implication with a full fee interest. See Zainey v. Linde, 1925, 121 Wash. 572, 209 P. 1085. Hence, the taking in 128–98 of the "full fee simple title" took also any appurtenant water rights. No express reservation of such rights appears. The reservation contained in the declaration of " * * * easements * * * for existing irrigation ditches, canals, and laterals owned by the Richland Irrigation District" refers to easements for the purpose of carrying water to other lands within the District.

■ The language in 128–100 taking "all water rights" was not intended to take and could not have taken the bene-

ficial interest in the water. The water rights were a proper part of the fee interest taken in 128–98. The declaration in that case was filed before the declaration in 128–100, which stripped 128–100 of any power to take other than a bare legal interest. That the declaration of taking in 128–100 took no more than a bare legal title is made explicit by the following statement contained in the amended petition for condemnation in 128–100:

"VI. That the real property and interests therein described in paragraph IV hereof constitute all of the operating properties and facilities owned of record or claimed by the Richland Irrigation District, a municipal corporation of the State of Washington. That petitioner, United States of America, by reason of its ownership of all the real property lying within the boundaries of said Richland Irrigation District is in truth and in fact the equitable owner of the real property and interests therein described in Paragraph IV hereof, subject only to the lien of the bonded indebtedness of said Richland Irrigation District, and said Richland Irrigation District, a municipal corporation of the State of Washington, now holds legal title thereto in trust for the use and benefit of petitioner, United States of America. That the sum of $36,020 deposited in the registry of this court with the filing of declaration of taking No. 98, covering the foreclosed lands of said Richland Irrigation District, and the sum of $48,300 deposited in the registry of this court with the filing of declaration of taking No. 100 therein, together represent a sum which with the bond redemption fund of said Richland Irrigation District is sufficient to pay and discharge all of the bonded indebtedness of said Richland Irrigation District."

The amended petition for condemnation in 128–100 explicitly states that the United States is already the equitable owner of the interests therein described and that the deposit in 128–100 is being made for the purpose of paying and discharging the bonded indebtedness of the District. This seems sufficiently plain to have advised the District that the Government was not taking separately the equitable interests in the foreclosed lands and in the appurtenant water rights.

The District is inconsistent in arguing that the water appurtenant to the foreclosed lands but not that appurtenant to the private lands should be valued in 128–100. A petition for condemnation in an action against one of the private landowners appears in the record. It seeks to condemn, in language almost identical to that of the declaration of taking in 128–98: "The fee simple title subject, however, to existing easements for public roads and highways, for public utilities, for railroads, for pipe lines, and for existing irrigation ditches, canals, and laterals owned by the Richland Irrigation District." The declarations against the private lands as well as that against the foreclosed lands omitted any specific mention of water rights. Yet the District does not contend that it was improper to value the private lands as irrigated lands with an assured and adequate water supply, that is, with water rights. No reason appears why the foreclosed lands should be treated differently from the private lands.

We now consider the alternative contention of the District that the trial court's valuation of the foreclosed lands together with the water allocable to them was inadequate and has no proper support in the evidence. In 128–98 the court found the value of the foreclosed lands with appurtenant water to be $51,912.94, and the value of the foreclosed lands without appurtenant water to be $6,649.60. However, the court, in fixing the value of the lands with water available made an allowance for $62,104.78 paid by the Government in 128–100 for the purpose of discharging the District's bonded indebtedness. Thus the court valued the land with water at $114,017.72, and the water was valued at the difference between $114,017.72 and $6,649.60, or $107,368.12.

This implied finding that the water rights were worth not more than $107,-368.12 is said to be without substantial support in the record. The District relies upon the testimony of two of its witnesses who testified as to the value of the water rights if sold separate from the land and outside the District. One of these witnesses thus valued the water at $3.25 per acre foot for the 62,000 acre feet allocable to the foreclosed lands, or approximately $200,000; the other valued the water at "between sixty and seventy dollars an acre", or between $243,000 and $284,000. The Government introduced no evidence as to the value of the water separate from the land if sold outside the District. The District's position is that since the witness placing the lowest value on the water if sold apart from the land testified that it was worth around $200,000, there was no basis in the evidence on which the court could value the water, as it impliedly did, at around $107,000.

This argument overlooks a crucial finding of fact made by the trial court, towit, "the highest and best use to which the undiverted portion of the water rights of the Richland Irrigation District could have been put, was its application to the lands under District ownership for the irrigation of the same." The meaning and basis of this finding is set forth in an oral opinion of the court which reads, in part, as follows:

"From the evidence in the case it is my conclusion that the highest and best use for this land at the time the government took it was for agricultural purposes, with the water to be used on this land and not separated from it and sold elsewhere. I have taken into consideration the evidence here that lands might have been irrigated with this water along what has been called The Horn, and adjacent to Kiona in Benton County, but in the first place there isn't any showing that there was any demand for this quantity of water, a block of water, or water, rather, sufficient to irrigate a block of some 4,000 or more acres of land. Necessarily a purchase of that quantity of water could come only from an irrigation district or from a water company or from the Reclamation Bureau, and there isn't any showing that there was any such purchaser ready, able and willing to buy.

"For another thing, it would be necessary in order to apply this water to those lands that it be pumped for a height ranging from 200 to 300 feet, and it just doesn't seem to me that there has been shown here enough difference between the quality of the land along The Horn and Kiona, and this land in the district which the district owned, the 4400 acres, that there was enough difference to warrant somebody buying that water and pumping it two or three hundred feet. I don't think there's any evidence in the record to show what it costs to buy pumping machinery, buy power, and pump water at that considerable height. I think Mr. Miller did testify that so far as the district was concerned, he thought about 35 feet was the limit. There has been evidence here of pumping to greater heights, but we all know and I think of course the court may take judicial notice of the fact that it does entail considerable expense to pump water two or three hundred feet and apply it to land, and this land is raw land and not cultivated at the present time, so taking all these elements into consideration, it is my view that the highest and best use for the water and the land taken by the government was irrigation of the land with the water, as it existed in the district rather than diverting the water or separating it from the land and using it outside the district."

■ The trial court seems to have taken the view that evidence of value of water sold separate from the land and outside the District should not be considered since there was no showing

of a prospective purchaser for that purpose. Cf. Olson v. United States, 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236. The trial court throughout the proceeding took the position that if it could be shown that a greater value could be realized by selling the water separate from the land, he would allow that value as the highest and best use of the assets condemned,—the land and the water. The trial court concluded, however, that since no market could be shown for the sale of the water outside the District, its highest and best use was on the lands in the district for which it constituted a sufficient but not overadequate supply. The court's determination that the value of the land with the water was $114,017.72 has a proper basis in the evidence.

■ Error is specified in the rejection of an offer of proof relating to sales of lands in the Roza Division of the Federal Yakima Project. The offer was for the purpose of showing that there existed a substantial market for lands in the Roza Division, the buyer paying for the land itself, and also assuming an obligation to repay in forty years without interest a then estimated construction cost amounting to $240 per acre, which obligation had in 1943 an approximate present value of $120 per acre. In support of this contention the District cites United States v. 5139.5 Acres of Land, 4 Cir., 200 F.2d 659, a case in which the judgment in a condemnation action was reversed partly because of a failure of the trial court to admit testimony as to sales of similar lands. In that case, however, the evidence was excluded not because the trial court in the exercise of its discretion found the sale, as to which the testimony was offered, to be in fact dissimilar, but because the trial court excluded the testimony by erroneously applying the hearsay and best evidence rules. In this case the offer was rejected on the ground that it was an attempt to show a dissimilar situation and not for the purpose of showing comparable sales of land.

■ The District's remaining argument is that the Court erred in rejecting an offer to prove the value, by way of reproduction cost, of the irrigation properties of the District, consisting of canals, ditches, laterals, and diversion works. The offer was rejected on the ground that the irrigation assets had already been valued and compensated for in the actions against private landowners. Such a ruling was required by the application of the so-called Schwellenbach formula, the use of which was approved by this court in United States v. Priest Rapids Irrigation District, 9 Cir., 1949, 175 F.2d 524. In this branch of its argument the District urges that United States v. Priest Rapids Irrigation District, supra, be overruled. This we decline to do.

■ The Schwellenbach formula was adopted in order to deal with the unprecedented situation which grew out of the Government's action in condemning entire irrigation districts. The purpose of the formula was to properly allocate for trial, either in the actions against the individual landowners or in a general action against the irrigation district, the various elements of value taken by the Government when it condemned all the land in an irrigation district. In the individual actions the landowners were compensated for the land as land with an adequate water supply available at a certain charge. The private lands were thus valued as irrigated lands enhanced in value by the assets of the District directly devoted to supplying the land with water. By thus compensating the landowners the Government paid the value of the irrigation assets as measured by their highest and best use, namely, enhancing the value of the lands. To allow further compensation for these assets as measured by their reproduction cost in 128–100 would be double compensation. Moreover, compensation based on reproduction cost would not measure the real worth of the irrigation facilities, which had value only in that they serviced the land and thereby enhanced its value. The Schwellenbach formula furthered the award of just

compensation by affording a rational solution to a difficult valuation problem. It compensated the landowners for the value of the irrigation assets as measured by their highest and best use in enhancing the value of the land, and at the same time prevented a double recovery.

 It has been said that the District was placed at a disadvantage by the valuation of the foreclosed lands together with appurtenant water rights in 128–98 in that it was maneuvered out of a jury trial on the value of the water rights. The District, after having stipulated for a non-jury trial in 128–98, made no motion to be relieved of its stipulation either at the time in the trial of 128–98 when the court took evidence of the value of the water rights or at any other time. The District did not complain that it was deprived of a jury trial in its motion for a new trial, or in the specifications of error or briefs before this court.

The judgments entered in cases 128–98 and 128–100 are affirmed.

CHAMBERS, Circuit Judge (dissenting).

I dissent. First, I state that were the Schwellenbach formula described hereinabove and more fully outlined in United States v. Priest Rapids Irrigation District, 9 Cir., 175 F.2d 524, before us for the first time, I might concur in Judge Denman's dissent in that case.

The so-called Schwellenbach formula is worthy of Merlin, the magician. The formula works this way: the cases of the individual farmers who are suffering condemnation are brought on for trial. These owners attempt to show the nature and value of the irrigation system which serves them. This they are refused, and they are permitted only to show the value of the land with "an adequate water supply." They are told the value of the assets of the irrigation district will be determined in a separate suit—Priest Rapids facilities will be valued in 128–99 and Richland in 128–100.[1] Then 128–99 and 128–100 come on for trial. The farmers who owned the districts are told (by the court telling their districts) that these cases against the districts take not valuable rights but only "bare bones"; that all the value in irrigation assets was taken when the farm land was taken from the individual landowners. The effect of this is that everything is taken from the district and the landowners and no witness is permitted to tell and no jury is permitted to hear whether the dams owned by the district are good for one more year or for two hundred years. It remains a shrouded secret whether the districts' ditches are infested with rodents and leak badly or whether they are cement lined. The districts had roadways. Were they paved or were they in horrible shape? Possibly a dam, a ditch, a roadway or a pump has no second hand value. But how are we to know without evidence?

Nevertheless, no one sought certiorari in Priest Rapids, supra. So, wondrous as the Schwellenbach formula is to me, I would apply it all of the way through this Hanford condemnation. I cannot see one rule for one fork of the river and another rule for another fork in two cases started at the same time.

But still accepting the Schwellenbach formula for Richland, I have trouble with the trial court's handling of the case. It is I who thinks Richland was maneuvered out of a jury where it was entitled to one. We may grant that Washington water law holds that water is appurtenant to the land. Ordinarily, a taking of land would take with it the land's water. But it is my belief that under the pleadings and declarations of the United States herein the defendants were entitled to think that the government had chosen artificial ground to stand on, that it had chosen to have the water

1. At one point in the 128 series of condemnation proceedings, it was necessary for the trial judge to force the United States to file the notices of taking in the 128–98, 128–99 and 128–100 cases on the district interests under threat of granting new trials in all of the individual farmers' cases.

belonging to the "foreclosed lands" described in 128–98 valued in 128–100. (And I believe Richland had a right to accept this artificial division.) I find credence for this in the fact that while the declaration in 128–100 mentions water rights, the declaration in 128–99 filed the same day, to clean up the job of taking all of Priest Rapids' assets not already taken from the farmers, does not mention water rights. When the 128–98 and 128–100 (Richland) and 128–99 (Priest Rapids) declarations were filed the government had completed taking by condemnation or purchase all lands in the Priest Rapids district. It seems to me Richland was entitled to meet the government on battle lines the government had drawn—land alone in 128–98 and water for 128–98 lands in 128–100.[2] Richland waived a jury in 128–98 and asked for one in 128–100. It is to be recalled that the trial in 128–98 began first while Priest Rapids was on appeal. The trial had run for less than a day when all further proceedings were suspended as to Richland pending determination of the appeal in Priest Rapids.[3] Months later, after the Priest Rapids decision came down from this court, a pretrial conference (in the middle of 128–98) was held. At the conclusion thereof, the parties were informed clearly that the water on the foreclosed lands would be valued in 128–98 and that the trail court would direct a verdict for one dollar in 128–100, the jury case, when it came up for trial. This one dollar verdict would be somewhat less than the amount of $48,300 deposited by the government in 128–100 with its declaration of taking.

It would seem that the trial court was acting wisely in moving the appurtenance—water—over to 128–98 for valuation along with the foreclosed land to which it belonged, provided Richland lost no substantial rights. But then and there the effect was to deprive Richland of a trial of the value of its water before a jury. Richland did not complain then and has not complained expressly here that it was denied a jury trial in 128–98 for its water. But it has lustily complained all of the way that water was valued in 128–98 when it should have been valued in 128–100. I think I know why they complain—no jury in 128–98. It is easy to say, "If Richland was dissatisfied with not having a jury when the trial resumed in 128–98, it should have asked to be relieved of its waiver of jury." Maybe lawyers can be found who, after the start of a trial without a jury, would rise and tell a trial court, because of an unanticipated turn, they now wanted a jury trial. But I wonder, if we asked those who would do so to form a line, how many would stand in the line.

2. It is true that the amended petition in 128–100 which describes water rights of Richland, canals, ditches, laterals, easements, appurtenances and some small tracts of land apparently part of the irrigation system (but not the foreclosed lands described in 128–98) does say that the government claims that by reason of its ownership of all the real property lying within the Richland Irrigation District it was the equitable owner of everything described in 128–100. Maybe full beneficial title to the water on 128–98 lands was taken with the land when the declaration of taking was filed, rather than when final judgment was entered. (128–1 to 128–100 were all a part of the overall condemnation begun originally as "128" without subdivision numbers, which came later.) But it still seems Richland justifiably relied on the value of the water for the lands of 128–98 being in 128–100. For what was $48,300 deposited in 128–100? Bare legal titles?

3. In the one day abortive session the plaintiff offered only one valuation witness, who gave testimony as to the land with and without a water right. The defendant presented two witnesses. The testimony of both of defendant's witnesses seems to be as to the value of the land, nonirrigated but irrigable. One positively excluded the value of water from his figure and, as I read the testimony of the other, I believe he did likewise.

During this first session the defendant district was at all times stoutly insisting that the water should be valued in 128–100. The trial court was inclining to a view that the appurtenant water should be valued in 128–98, but also freely received testimony of the value of the land without water.

Wouldn't there be a little reluctance to test human frailty, judicial though it may be? When the shift came, when for the first time the issues were clearly delineated (midway in the trial), I say that Richland was entitled to a mistrial on the court's own motion.

Two weeks ago in Bloch v. United States, 9 Cir., 221 F.2d 786, this very court picked out an instruction on wilfulness, with which the defendant seems to have been satisfied, and used the instruction as ground for reversal. Is it a less fundamental matter when a defendant midway in trial loses the jury to which he was entitled under the original framing of the issues? Is it an answer to say to the defendant, "Yes, you complained that the issues were not being tried where you thought they were going to be tried, but you haven't had the nerve to tell the trial judge after he 'shifted the field' that you no longer wanted him; therefore, no harm has been done"?

I would reverse the judgment in 128–98.